Ralph E. **KENNEDY**, **Regional Director of Region 21 of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL 108, Respondent.**

**No. 68–898–AAH.**

United States District Court
C. D. California.

Aug. 1, 1968.

Milo V. Price, Atty., N.L.R.B., Los Angeles, Cal., for petitioner.

Robert W. Gilbert, and Gilbert & Nissen, Beverly Hills, Cal., for respondent.

Morton B. Jackson, and Hodge, Jackson, Kumler & Croskey, Los Angeles, Cal., for the charging parties.

## DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING PRELIMINARY INJUNCTION

HAUK, District Judge.

This proceeding is before the Court on a petition, as amended, filed by the Regional Director of Region 21 of the National Labor Relations Board (hereafter Board), pursuant to Section 10(l) of the National Labor Relations Act, as amended (29 U.S.C. Sec. 160(l)), for a preliminary injunction pending the final disposition of the matters involved pending before the Board on charges filed with the Board by Reliable Steel Supply Company (hereafter

Reliable), Sugden Engineering Company (hereafter Sugden), and Metal Products Manufacturers Association, alleging, in substance, that, *inter alios*, the respondent has engaged in unfair labor practices within the meaning of Sections 8(b) (4) (A) and (B) and 8(e) of the Act (29 U.S.C. Secs. 158(b) (4) (A) and (B) and 158(e)). The petition for injunction is predicated on the conclusion of the Regional Director that he has reasonable cause to believe that the respondent has engaged in the unfair labor practices charged and that complaint of the Board based on the charges should issue. Having reached such a conclusion, the Regional Director is required by Section 10(*l*) of the Act to petition the Court for a temporary injunction against a continuation of the unfair labor practices. Retail Clerks Union, Locals 137, etc. v. Food Employers Council, Inc., 351 F.2d 525 (9th Cir. 1965).

The charges were filed with the Board on November 28, 1967, and were received by the respondent on or about November 30, 1967. The charging parties contend, in substance, that the respondent engaged in unfair labor practices within the meaning of, *inter alia*, Sections 8(b) (4) (ii) (A) and (B) and 8(e) of the Act, which sections proscribe conduct designed to compel a person to enter into a so-called hot cargo agreement secondary boycott activities, and the entering into of hot cargo agreements, respectively.

The respondent is affiliated with the Sheet Metal Workers' International Association, AFL-CIO (hereafter International), as a sheet metal building and construction workers' local whose members fabricate, erect, and install sheet metal products and materials on construction projects. Other local unions affiliated with the International include sheet metal production workers' locals and industrial sheet metal workers' locals whose members are employed in manufacturing plants for the mass production of sheet metal products used in the construction industry. The sheet metal construction workers' locals customarily negotiate wage rates with employers which are higher than wage rates negotiated by sheet metal production workers' locals or industrial sheet metal workers' locals.

Reliable manufactures in Los Angeles, California, metal products, including round pipe and fittings, generally used in the installation of air conditioning and heating systems. Reliable has recognized and has had a collective-bargaining agreement with Sheet Metal Workers Association Local 170, a sheet metal production workers' local affiliated with the International. Reliable is a member of Metal Products Manufacturers Association (hereafter MPMA), an association of employers engaged in the manufacture and distribution, at wholesale, of sheet metal pipe, ducts, fittings, and other products of sheet metal used in the heating, ventilating and air conditioning industry.

Sheet Metal and Air Conditioning Contractors Association of Southern California, Inc. (hereafter SMACCASC), and Heating, Ventilating and Air Conditioning Contractors Association (hereafter HVAC) are associations of employers engaged as sheet metal, heating, ventilating, and air conditioning installation contractors in the building and construction industry in the Southern California area. For the past several years, SMACCASC and HVAC, on behalf of their respective employer-members have recognized and bargained collectively with the respondent as the collective-bargaining representative of the employees of their respective employer-members engaged in the installation of sheet metal materials and products on construction jobs and in the fabrication in their shops of custom-made sheet metal products for erection or installation on their construction projects. As of January 1, 1968, SMACCASC had approximately 104 members. As of the same date HVAC had approximately 48 members.

About July 1, 1965, SMACCASC and HVAC, each acting for and on behalf of

their respective employer-members, entered into a written collective-bargaining agreement with the respondent effective to June 30, 1970. In April, 1966, HVAC and the respondent adopted and put into effect a revision and modification of their agreement entitled "Standard Form of Union Agreement, Form A–4–66," replacing a portion of their agreement previously entered into entitled "Standard Form of Union Agreement, Form A–5–15–63." In September, 1967, SMACCASC and the respondent adopted and put into effect the same revision and modification. The collective-bargaining agreement between SMACCASC and HVAC and the respondent, as revised by Standard Form A–4–66, the pertinent provisions of which are set forth in Findings of Fact hereinafter made, prohibits the signatory employer-members of SMACCASC and HVAC from purchasing round pipe and fittings for commercial or industrial projects from fabricators or manufacturers who pay their employees engaged in such fabrication or production less than the prevailing wage for comparable sheet metal fabrication or production as established under agreements between the respondent and other employers. Thus, contractors signatory to the collective-bargaining agreement with the respondent are precluded, under the terms of the agreement, from purchasing round pipe or fittings from Reliable, or from other members of MPMA, none of whom has recognized or has a collective-bargaining agreement with the respondent.

According to an affidavit of Joseph Wilson, president of Russell Heating & Air Conditioning Co. (hereafter Russell), an employer-member of HVAC and a signatory to a collective-bargaining agreement with the respondent, early in June, 1967, Paul Massie, respondent's business agent, visited Wilson in his office and told him that Russell was going to be cited before the Joint Adjustment Board for being in violation of the agreement since the agreement did not allow Russell to buy round pipe but, rather, required Russell to fabricate it

in his own shop. Wilson told Massie that he had always bought his round pipe from Reliable; that Reliable was a union shop; and that he was not in violation of his agreement with the respondent. Wilson makes no round pipe in his shop. He has bought virtually all of it from Reliable for the past 20 years. He does not have the machinery to make such pipe. Wilson states that it would be totally uneconomical for him, and other shops like his, to make round pipe and fittings.

According to an affidavit of Irwin Rudly, president of Crenshaw Sheet Metal Company (hereafter Crenshaw), on December 13 or 14, 1967, Rocky Stoneburner, a business agent of respondent, visited Rudley at his shop, read to him a section of the contract requiring the fabrication and installation of metal by members of the respondent, and told Rudley that on commercial projects he could not use round pipe purchased from Reliable. Stoneburner threatened to require Crenshaw to pull out of its projects any round pipe found to have been fabricated by nonmembers of respondent. According to Rudley, Crenshaw has been using Reliable round pipe for the past 16 years, having obtained virtually all of its requirements from that supplier.

The petitioner also filed with the Court an affidavit of Lynn Mecham, who, with his wife, operates a sheet metal business in Inglewood, California, and who is a signatory to a contract with the respondent. According to Mecham's affidavit, in May, 1968, respondent's business agent, Stoneburner, came to Mecham's shop where he told Mecham that under his contract with the respondent he could not buy any round pipe from Reliable and that if, for commercial projects, he continued to buy round pipe from Reliable, or from any other shop not employing respondent's members, respondent would cancel its contract with Mecham.

A substantially similar affidavit of Richard G. Beam, owner of Beam Heating and Air Conditioning Company in

Inglewood, California, was filed by the petitioner. According to Beam, he has a collective-bargaining agreement with the respondent, which expires in 1970, and employs members of the respondent. During the 15 years Beam has been in business, he has always purchased his requirements of round pipe, elbows, and other fittings, from Reliable. About May 21, 1968, respondent's business agent, Stoneburner, visited Beam at his shop, at which time he told Beam that the respondent was going to strictly enforce the provisions of its contract and would require the contractors to either make their own round pipe and fittings or purchase them from shops employing respondent's members. Stoneburner told Beam that he could no longer purchase pipe from Reliable, and that if Beam continued to buy pipe and fittings from Reliable he would be in violation of his contract, and the contract would be subject to cancellation. Stoneburner also threatened to refuse to refer employees to Beam if he continued to buy from Reliable and suffer a cancellation of his contract.

The petitioner also filed an affidavit of Stanley Feuer, vice president of Feuer Corp., a member of SMACCASC, who avers that he had recently been approached by respondent's business agent, Stoneburner, and had been told that he no longer could buy round pipe not produced by respondent's members. To avoid trouble with respondent, Feuer decided not to use pipe purchased from Reliable.

An affidavit of Glenn Darrow, general manager of Darrow Heating & Air Conditioning Corp., filed by petitioner, recites that Darrow, a member of HVAC, is capable of producing 5,000 feet of round pipe per day but produces only about 300 feet per day, principally for its own jobs. During the past year, Darrow sold to other contractors about $300 worth of round pipe.

In about August, 1967, the respondent prepared and proposed to SMACCASC and HVAC a joint letter to be sent to the employer-members of the two associations advising the members, in effect, that as of January 1, 1968, sheet metal work for other than residential installation would have to be performed only by employees covered by the agreement unless a waiver was obtained from the respondent. The proposed letter threatens the assessment of liquidated damages for a violation. Although the letter was approved by the Board of Directors of SMACCASC, it was not sent to the members. Even though it was not distributed to the members, the letter called to the attention of the Boards of Directors of the two associations the threat of a fine for a breach of the collective-bargaining agreement, and clearly indicated a reaffirmation and demand for compliance with the provisions involved.

John Bantick, managing director of SMACCASC, in an affidavit filed by the petitioner, states that numerous conversations were had between him and the representatives of the respondent concerning the purchasing of round pipe from shops not employing respondent's members. It was in this connection that the proposed joint letter was prepared. Bantick states in his affidavit that insofar as is known to him, no member of SMACCASC manufactures traditional round pipe, although some make spiral pipe, which is not involved in this proceeding.

In or about October, 1967, respondent and George S. Fawcett Company (hereafter Fawcett), a member of SMACCASC, entered into a written contract containing the clauses under consideration in this proceeding.

Based upon a survey conducted by Samuel W. Block, president of Reliable, as reflected in an affidavit and supplemental affidavit obtained from Block and filed in the instant proceeding, a substantial number of members of both SMACCASC and HVAC have in the past purchased their requirements of round pipe from Reliable. Thus, of the 48 members of HVAC, 20 of them had informed Block in response to a questionnaire sent to them that 100 percent of their requirements of round pipe had

been purchased from production companies such as Reliable for the past several years. Another seven of the members of HVAC stated that they purchased a substantial amount of their requirements—from 90 to 98 percent—from production companies such as Reliable. Of the 104 members of SMACCASC, at least 18 responded that during the past several years they had purchased a substantial amount of their requirements of round pipe from production companies such as Reliable. It thus appears plain that a substantial number of members of SMACCASC and HVAC have, during the past several years, purchased their requirements of round pipe from Reliable or other production companies.

The Block survey reflects that at least 137 contractors in the Southern California area who responded to the questionnaire submitted to them purchased all of their requirements of round furnace pipe and fittings for commercial and residential work from production companies such as Reliable. None of these contractors fabricated any round pipe or fittings in their own shops. Another 63 contractors in the Southern California area responded that they purchased a substantial amount of their requirements of such pipe and fittings for commercial and residential work from production companies such as Reliable. The Block survey was conducted by mail, with a response signed by the contractor or his representative having been returned.

In answer to the petitioner's request for injunction, respondent takes the position that the affidavits filed by the petitioner are unreliable and should be rejected and that oral testimony should be heard. Respondent also contends that the proceedings are barred by the 6-month period of limitations contained in Section 10(b) of the Act, apparently taking the position that evidence is lacking of any attempt to compel enforcement of the attacked clauses or of a reaffirmation of such clauses. Respondent also argues that the conduct of its business agents in approaching the contractors here involved was designed to preserve and protect what respondent contends is traditionally and fairly claimable bargaining unit work and to maintain bargaining unit standards.

The Court has examined the record before it, which includes the petition for injunction, affidavits, memorandum of points and authorities, and appendices thereto, and the affidavits and memorandum of points and authorities of respondent filed in opposition to the petition. The matter has been extensively argued by counsel for all parties, in writing and orally. The Court has reviewed all of this material and has considered the arguments, and concludes that on the basis of the pleadings, evidence, briefs, arguments of counsel, and the entire record in the case, an injunction pending final disposition of the matters involved pending before the Board should issue.

Now, having heard the arguments and having examined all the files, documents and records herein, the cause having been submitted for decision, and the Court being fully advised in the premises, the Court renders its decision.

## DECISION

*There is reasonable cause to believe that the respondent engaged in conduct proscribed by Sections 8(b) (4) (ii) (A) and (B) and 8(e) of the National Labor Relations Act, as amended.*

The pertinent sections of the Act provide:

Sec. 8(b) "It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

4(ii) "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

(A) forcing or requiring any employer \* \* \* to enter into any agreement which is prohibited by Section 8(e);

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * *.

* * * * * *

Sec. 8(e) "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: * * *."

The provisos relating to the construction and apparel industries are inapplicable here and are omitted. See National Woodwork Mf'rs Ass'n v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

The declared purpose of the secondary boycott provisions of the 1947 Taft-Hartley Act was to limit the area of industrial dispute, in order to confine its effects to the parties immediately concerned, and to prevent its extension to employers and employees not directly involved. As the Supreme Court pointed out, these provisions were aimed at "shielding unoffending employers and others from pressures in controversies not their own." N.L.R.B. v. Denver Bldg. & Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951); N.L.R.B. v. Laundry, Linen Supply & Dry Cleaning Drivers, etc., 262 F.2d 617, 619 (9th Cir. 1958); Retail Fruit & Vegetable Clerks Union, etc. v. N.L.R.B., 249 F.2d 591, 600 (9th Cir. 1957). However, in the interval between the passage of the Taft-Hartley Act and the 1959 amendments, labor organizations sometimes circumvented the secondary boycott proscriptions by successfully exacting from employers' so-called "hot-cargo" agreements under which the employers relinquished their freedom to handle or provide goods and services for or to employers whom the contracting union considered "unfair." The Supreme Court, in Local 1976, United Brotherhood of Carpenters, etc. v. N.L.R.B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), held that such agreements were not illegal, pointing out that under the then-existing secondary boycott provisions, contained in Section 8(b) (4), the legal prohibition was directed not at any contractual *agreement* entered into on the part of the employer, but only at union inducement of employees to refuse to handle goods. Thus, although the Supreme Court held that the execution of hot-cargo agreements and voluntary compliance therewith by the employer were lawful, it also held that the inducement of employees to strike or refuse to handle "hot goods" with the object of forcing employers to abide by the hot-cargo agreements was unlawful. Such hot-cargo agreements, the Court held, did not constitute a defense to violations of the secondary boycott provisions in Section 8(b) (4) of the Act (29 U.S.C. Sec. 158(b) (4)). *Local 1976*, supra.

Cognizant of this "major weakness in the law against secondary boycotts" (II Legislative History of the Labor-Management and Disclosure Act of 1959 (G.P.O.1959) (hereafter Leg. Hist. '59) 1708), Congress, in the 1959 amendments, undertook to close the "loop holes" which permitted labor organizations to circumvent these boycott provisions. N.L.R.B. v. Servette, Inc., 377 U.S. 46, 51, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). Thus, Section 8(e) made unlawful "any contract or agreement, express or implied" whereby an employer agrees not to handle products of another employer or agrees to cease doing business with any other person. In addition, Congress amended Section 8(b) (4) (A) to prohibit a strike or threat to strike or other pressure designed to

achieve such an agreement. Employing Lithographers of Greater Miami, Florida v. N.L.R.B., 301 F.2d 20 (5th Cir. 1962).

■ Section 8(e)'s origin makes it plain that Congress intended the established law of secondary boycotts to serve as a guide in the application of this new provision. Consistent with this legislative intention, the Board and the courts have uniformly found Section 8(e) violations wherever contractual devices have been used to achieve a *secondary* object, that is, where a contract provision is not really directed at the labor conditions of the contracting employer but at those of some other employer. N.L.R.B. v. Joint Council of Teamsters No. 38, etc., 338 F.2d 23, 28 (9th Cir. 1964); N.L.R.B. v. Milk Wagon Drivers' Union, Local 753, 335 F.2d 326, 328–329 (7th Cir. 1964); Truck Drivers Union, Local No. 413, etc. v. N.L.R.B., 118 U.S.App.D.C. 149, 334 F.2d 539, 547 (1964), cert. den., 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); Bakery Wagon Drivers and Salesmen, Local Union No. 484 v. N.L.R.B., 116 U.S.App.D.C. 87, 321 F.2d 353, 358 (1963); Los Angeles Mailers Union No. 9, etc. v. N.L.R.B., 114 U.S.App.D.C. 72, 311 F.2d 121 (1962); Employing Lithographers of Greater Miami, Florida v. N.L.R.B., 301 F.2d 20, 30 (5th Cir. 1962).

■ On the other hand, neither the Board nor the courts have read Section 8(e) literally so as to ban all agreements which provide for a cessation of business between employers. As the Court of Appeals for the Ninth Circuit has pointed out,

"* * * section 8(e) is not to be applied literally to prohibit all union-employer agreements limiting subcontracting. More particularly, an agreement which restricts subcontracting to protect the job opportunities of the employees of a signatory employer, and not to apply secondary pressure upon third party employers, may be beyond the purpose of section 8(e) and excepted from its proscription."

[N.L.R.B. v. Joint Council of Teamsters No. 38, 338 F.2d 23, 28 (9th Cir. 1964).]

See also Meat and Highway Drivers etc., Local 710, etc. v. N.L.R.B., 118 U.S. App.D.C. 287, 335 F.2d 709, 713–716 (1964); Truck Drivers Union, Local No. 413, etc. v. N.L.R.B., 118 U.S.App.D.C. 149, 334 F.2d 539, 548 (1964); Orange Belt District Council of Painters, etc. v. N.L.R.B., 117 U.S.App.D.C. 233, 328 F. 2d 534, 538 (1964); District No. 9, Intern. Ass'n of Machinists, etc. v. N.L. R.B., 114 U.S.App.D.C. 287, 315 F.2d 33, 36–37 (1962). Distinctions must be made between prohibitions on subcontracting which merely serve as legitimate job protection devices and those which go further to accomplish ends Congress meant to prohibit. Todd Shipyards Corp. v. Industrial Union of Maine and Shipbuilding Workers of America, Local 39, 344 F.2d 107, 109 (2nd Cir. 1965). In the light of the manifest statutory purposes, the test is "whether a particular agreement is fairly within the intendment of Congress to do away with the secondary boycott." District No. 9, Intern. Ass'n of Machinists, etc. v. N.L. R.B., 114 U.S.App.D.C. 287, 315 F.2d 33, 36 (1962). Hence, where employers and unions enter into contracts designed to protect the job opportunities and working standards of the employees in the unit covered by the contract, Section 8(e) has been deemed inapplicable. Congress did not intend to prohibit such primary agreements, even though they will sometimes result in a signatory employer's refusal to do business with another employer. N.L.R.B. v. Joint Council of Teamsters No. 38, 338 F.2d 23 (9th Cir. 1964); Meat and Highway Drivers, etc. Local 710, etc. v. N.L.R.B., 118 U.S.App.D.C. 287, 335 F.2d 709, 713 (1964); Todd Shipyards Corp. v. Industrial Union of Maine and Shipbuilding Workers of America Local 39, 344 F.2d 107, 108–109 (2nd Cir. 1965); Lewis v. N.L.R.B., 122 U.S.App.D.C. 18, 350 F.2d 801, 802 (1965); and see, Orange Belt District Council of Painters, etc. v. N.L.R.B., 117 U.S.App.D.C. 233,

328 F.2d 534, 538–539 (1964); Retail Clerks Union, Local 770, etc. v. N.L.R.B., 111 U.S.App.D.C. 246, 296 F.2d 368, 373–374 (1961); N.L.R.B. v. Milk Wagon Drivers Union Local 753, 335 F.2d 326, 329 (7th Cir. 1964).

■ The vice of a Section 8(e) agreement is that it is not limited to such primary considerations as the working conditions of the unit employees; rather, it is "aimed really at the union's difference with another employer" (Local No. 636, United Association of Journeymen and Apprentices of Plumbing, etc. v. N.L.R.B., 108 U.S.App. D.C. 24, 278 F.2d 858, 864 (1960) as a means of exerting pressure on the latter, with whom the union has a primary dispute or otherwise disfavors.

■ Contract clauses which purport to limit subcontracting to employers who are signatories to union contracts, so-called union signatory clauses, and contract clauses which purport to acquire for bargaining unit employees work which has been customarily and traditionally performed by employees of other employers, so-called unit acquisition clauses, have been held violative of the Act. N.L.R.B. v. Joint Council of Teamsters No. 38, 338 F.2d 23 (9th Cir. 1964); Meat and Highway Drivers, etc. Local No. 710, etc. v. N.L.R.B., 118 U.S. App.D.C. 287, 335 F.2d 709 (1964); Truck Drivers Union Local No. 413, etc. v. N.L.R.B., 118 U.S.App.D.C. 149, 334 F.2d 539 (1964). Such clauses are viewed as not designed to protect the wages and job opportunities of the unit employees covered by the contract, but as directed at furthering general union objectives, and undertake to regulate the labor policies of other employers. Absent a direct relationship to protection of the work of unit employees such clauses are considered as having an unlawful secondary thrust and to be proscribed by Section 8(b) (4) and 8(e).

On the other hand, contract clauses whose basic aim is to limit subcontracting so as to preserve for unit employees work which has customarily been performed by them, or in some instances to recapture work regarded as fairly claimable by unit employees, so-called unit protection clauses, and contract clauses designed to limit subcontracting of unit work to employers who maintain the same standards of employment thus minimizing the economic incentive to subcontract, so-called union standards clauses, have been held lawful. Meat and Highway Drivers, etc., Local 710, etc. v. N.L.R.B., 118 U.S.App.D.C. 287, 335 F. 2d 709 (1964); Truck Drivers Union Local No. 413, etc. v. N.L.R.B., 118 U.S. App.D.C. 149, 334 F.2d 539 (1964).

The underlying rationale for the lawful character of the unit protection and union standards clauses is that a union has a primary interest in preserving unit work for unit employees, or in insuring that negotiated union standards will not be undermined. It is reasoned that a union may further such interests by prohibiting all subcontracting of unit work or by discouraging subcontracting by limiting it to employers whose work standards are not at a lower level. That such agreements may limit the employers with whom the primary employer may do business, or may disrupt an already established business relationship, is regarded as an incidental effect to protection of a primary right, and deemed not unlawful despite literal language in Section 8(e) which might suggest the contrary.

In National Woodwork Manufacturers Ass'n v. N.L.R.B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Supreme Court concurred with the Board's findings that the sole objective of the contract provision there involved was the protection and preservation of work traditionally performed by unit employees against diminution flowing from changes in technology and that the provision involved was not violative of Section 8(e) of the Act. The contract clause prohibited the purchase of items regularly fabricated by unit employees. The majority opinion, distinguishing work preservation clauses from work acquisition clauses, pointed out that the

Court had no occasion "today" to decide the questions which might arise where the employees carry on a boycott to reach out to monopolize jobs or acquire new jobs when their own jobs are not threatened by the boycotted products. Justice Harlan, in a concurring opinion, went further, stating that this "is not a case of a union seeking to restrict by contract or boycott an employer with respect to the products he uses, for the purpose of acquiring for its members work that had not previously been theirs." 386 U.S. 612 at 648, 87 S.Ct. at 1270.

After an extensive review of the legislative background, the Supreme Court concluded that the proscriptions of Section 8(b) (4) and 8(e) were only aimed at conduct having a secondary thrust and not at primary unit preservation, stating (386 U.S. at 644–645, 87 S.Ct. at 1268):

> "The determination whether the 'will not handle' sentence of Rule 17 and its enforcement violated § 8(e) and § 8(b) (4) (B) cannot be made without an inquiry into whether, under all the surrounding circumstances, the Union's objective was preservation of work for Frouge's employees, or whether the agreements and boycott were tactically calculated to satisfy union objections elsewhere. Were the latter the case, Frouge, the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, here the door manufacturer, for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees."

Thus, in any given case, contract clauses attacked must carefully be examined to ascertain if protection of unit work or union standards stands out as the central purpose, or if the clauses appear to encompass the broader objective of serving to promote the welfare of union members generally. If the clause can be reasonably construed to show that it does not protect the jobs of unit employees, while at the same time it limits the employers with whom the primary employer may do business, or if it undertakes to insert an element of control over the working conditions of another employer with whom the primary employer has been, or might be, doing business, it will fall within the proscriptions of the statute, and action to force an employer to accept it will be deemed unlawful.

The work involved here is the fabrication of round pipe and fittings. It is this work that the attacked provisions of the agreement are designed to govern and regulate. Thus, Article I, Section 1, specifies the work covered in terms which include round pipe fabrication, and Article II, Section 2, applies to the subcontracting of this type of work. Article VIII, Section 2, is sufficiently comprehensive in designation of the work covered to require that round pipe installed within the jurisdiction of some other local union be made by journeymen at a specific wage scale. Article VIII, Section 3, both specifies the wage which must be paid in the manufacture of round pipe which is purchased for residential work and confirms by implication that Article II, Section 2, applies to the subcontracting of round pipe fabrication for use in other than residential work. Finally, Article LIII, Section 1, and Article LXII, Section 2, particularly when read in conjunction with the definition of "Employee" contained in Article XV, Section 1, plainly proscribe the performance of sheet metal work, which includes round pipe fabrication, by other than unit employees.

In the joint letter drafted by and proposed to SMACCASC and HVAC re-

spondent referred to Article LIII, Section 1, and Article LXII, Sections 1 and 2, which prohibit the performance of sheet metal work for nonresidential installation by employees other than those in the unit. Early in June, 1967, respondent took the position that the contract did not allow the purchase of round pipe from Reliable, and that Russell Heating would have to fabricate its requirements of round pipe in its own shop. In the Beam Heating and Air Conditioning and Crenshaw episodes, respondent condemned the use of round pipe purchased from Reliable because Reliable was not represented by respondent and warned against using round pipe manufactured by shops not under contract with respondent.

It has not been shown that the fabrication of round pipe is "fairly claimable" unit work. It is apparent that the manufacture of standardized round pipe is different from custom fabrication, requiring different skills and machinery. These are two different industries—one the manufacturing industry and the other the sheet metal installation contracting division of the construction industry. Likewise, it has not been shown that it would be more economical for the installation contractors to fabricate in their own shops the sheet metal materials and products they install rather than to purchase such materials from a manufacturer engaged in the manufacturing industry.

It has been amply demonstrated that a substantial number of the installation contractors in the Southern California area normally and regularly purchase their requirements of round pipe and fittings from mass production manufacturers such as Reliable. It has not been shown that the employees in the unit customarily and traditionally have fabricated such items. "Customarily" and "traditionally" in that sense should be taken to mean that the employers in the common course of their business regularly assign such tasks to their employees and that when such items are used they are generally, or for the most part, fabricated by such employees. See Sheet Metal Workers Union Local 216 (Sheet Metal, Heating and Air Conditioning Contractors of Alameda and Contra Costa Counties), 172 NLRB No. 6 (1968).

It has not been shown that the fabrication of round pipe and fittings here involved is "fairly claimable" unit work. Nor has it been demonstrated that the respondent is entitled to "recapture" the fabrication of round pipe and fittings since it has not been shown that historically its members have consistently and regularly performed the fabrication operations. Instead, such work has been purchased from manufacturers. At the very least, it is not unreasonable to conclude that the work which is the subject of the contractual provisions in question here is not, and has not been, customarily and traditionally performed by the employees of the employer-members of SMACCASC and HVAC and, therefore, that the object of the restrictions so imposed was not the preservation of unit work. The facts here are distinguishable from those found by the Court in N.L.R.B. v. Local Union No. 28, Sheet Metal Workers International Association, etc., 380 F.2d 827 (2nd Cir. 1967), cited by respondent, in which the Second Circuit refused to enforce an order of the Board, which found the agreement there to be proscribed by Section 8(e) of the Act, on the ground that the union was seeking to preserve for its own members, who were employees of the employers belonging to two New York associations, the work of fabricating dampers which had traditionally been done in association shops by members of the union.

The above conclusion is reinforced by consideration of the factors suggested by the *National Woodwork* case, supra, in which the Supreme Court stated the necessity of examining all the surrounding circumstances in order to determine whether contractual restrictions, such as those involved in this proceeding, violate the provisions of Section 8(e) of the Act. As the Court there ob-

served (386 U.S. at 644, n. 38, 87 S.Ct. at 1268):

"* * * such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry."

In applying the first of the above factors to the subject case, any threat of displacement is indeed remote. It has not been shown that a substantial amount of round pipe and fittings has been produced by the employers in the two associations. Respondent has not shown any decrease in the employment of its members over the past several years.

Respondent has, and has had, no collective-bargaining agreement with Reliable, or with any other member of MPMA, and none of the members of MPMA employ members of respondent working under a collective-bargaining agreement with respondent. The collective-bargaining relationship existing between respondent in the circumstances of these cases is with SMACCASC and HVAC, and their employer-members. Respondent also has individual agreements with installation sheet metal contractors who do not belong to either association, such as Beam Heating and Air Conditioning and Lynn Mecham. On these facts, it is difficult to comprehend how the history of labor relations of the respondent and the boycotted employers, such as Reliable, would aid the respondent. Respondent has a collective-bargaining agreement with at least one employer, Darrow, who has the capacity to manufacture a substantial amount of round pipe and fittings but in the past has produced an insignificant amount for sale to other contractors. The effect of respondent's contract, and its conduct, is to acquire for Darrow, and other contractors having an agreement with respondent, work previously done by Reliable and other manufacturers of round pipe and fittings, and at the expense of

Reliable and such other manufacturers, and their employees. The alternative would be for Reliable and such other manufacturers to recognize and bargain with respondent and pay their employees a construction wage rate for the manufacture of commercial round pipe and fittings. The consequence of this would be for respondent to exercise control over the employment practices of Reliable and other like firms whose employees are not a part of respondent's bargaining unit.

An examination of the economic factors involved leads to a similar conclusion. It is plain that the installation contractors have no economic incentive to have the work of fabricating round pipe performed by their own employees, who are respondent's members, at construction wage rates when such work can be purchased from manufacturers at a substantially lower cost.

While respondent's contract with the two associations permits the subcontracting or the purchasing out of round pipe and fittings used for residential purposes, it precludes the purchase of such pipe for use in commercial projects. Thus, it is obvious that the clause was not intended to prohibit subcontracting of unit work.

The work in dispute cannot be characterized as "fairly claimable" unit work. As above noted, the contract clauses in question dictate the wage rates to be paid by Reliable, and other members of MPMA, who manufacture round pipe and fittings and whose employees are not represented by respondent and are not a part of the collective-bargaining unit here under consideration. One of the purposes of the clauses in question seems to be to benefit union members generally. The clauses appear to be "tactically calculated to satisfy union objectives elsewhere," and are not "addressed to the labor relations of the contracting employer *vis-a-vis* his own employees" which the Supreme Court has said in the *National Woodwork* case is "the touchstone" in determining their validity. 386 U.S. at 645, 87 S.Ct. 1250.

*These proceedings are not barred by the six-month period of limitations contained in Section 10(b) of the Act.*

■ The charges giving rise to the instant proceedings were filed with the Board on November 28, 1967, were served on respondent by mail and were received on or about November 30, 1967. The petitioner does not contend that the violation of the Act occurred on the original execution of the contract, but, rather, on the conduct of respondent in an effort to seek enforcement of, and compliance with, the terms of the original contract.

■ It is clear that the threats to Russell in June, 1967; the execution of a contract containing the new Standard Form with SMACCASC and with Fawcett in October, 1967; the position taken by respondent in the letter it drafted and submitted to the two associations for distribution to their members in August, 1967; the threats to Crenshaw in December, 1967; and the threats to Lynn Mecham and Richard G. Beam in May, 1968, all occurred within six months of the service upon respondent of the charges here involved. With respect to the incidents occurring after the filing of the charges, the law is well settled that such incidents may be considered by the Board in complaint proceedings before it, and by this Court. N.L.R.B. v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959).

■ The law is also well settled that the acts of continued enforcement of a contract within the six-month period preceding the filing of charges, or subsequent to the filing of charges, constitutes a new "entering into" the agreement within the meaning of Section 8(e) of the Act, despite the fact that the contract was initially executed before the six-month period of limitations had begun. District No. 9, International Association of Machinists, AFL–CIO, et al. (Greater St. Louis Automotive Trimmers and Upholsterers Association, Inc.), 134 NLRB 1354, enfd. 114 U.S.App. D.C. 287, 315 F.2d 33 (1962); Los An-geles Mailers Union No. 9, I. T. U. (Hillbro Newspaper Printing Company), 135 NLRB 1132, enfd. 114 U.S.App.D.C. 72, 311 F.2d 121 (1962); N.L.R.B. v. Milk Wagon Drivers' Union, Local 753, 335 F.2d 326, 329 (7th Cir. 1964); Dan McKinney Co., 137 NLRB 649 (1962); Sheet Metal Workers Local 216 (Sheet Metal, Heating and Air Conditioning Contractors, et al.), 172 NLRB No. 6 (1968).

It is plain that the respondent here entered into and reaffirmed the contract involved, and the clauses here under attack, and engaged in conduct proscribed by Section 8(b) (4) within six months of the filing of the charges, and that such conduct constituted a fresh violation of the Act. Thus, neither the Board nor this Court is precluded from dealing therewith merely because the original agreement lies beyond the limitations period.

*Respondent's conduct threatened, coerced, and restrained Russell, Crenshaw, and other persons, for objects proscribed by the Act.*

■ The facts summarized above amply demonstrate that there is reasonable cause to believe that respondent's conduct transgressed the area of permissible activity and amounted to prohibited threats, coercion, and restraint for objects proscribed by the Statute.

■ Under Section 8(b) (4) (ii) of the Act (29 U.S.C. Sec. 158(b) (4) (ii)), it is unlawful for a union to "threaten, coerce, or restrain any person" for the purpose of achieving any of the proscribed objectives. Section 8(b) (4) refers to *an object*, and where multiple objects are sought it is sufficient if one of them be an unlawful one. Denver Building and Construction Trades Council v. N.L.R.B., 341 U.S. 675, 688–689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); International Brotherhood of Electrical Workers, Local 501 v. N.L.R.B., 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); Department and Specialties Store Employees Union etc. v. Brown, 284 F.2d 619 (9th Cir. 1960), cert. den. 366 U.

S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961). This subparagraph forecloses threats of labor trouble or other consequences, and prohibits the carrying out of such threats or other economic retaliation. N.L.R.B. v. Local 3, IBEW, 325 F.2d 561 (2nd Cir. 1963); N.L.R.B. v. Highway Truckdrivers & Helpers, Local No. 107, etc., 300 F.2d 317, 320–321 (3rd Cir. 1962); N.L.R.B. v. International Hod Carriers, Bldg. and Common Laborers' Union of America Local 1140, 285 F.2d 297 (8th Cir. 1960), cert. den. 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1961); Fein Can Corp., 131 NLRB 59, enfd. N.L.R.B. v. Local 810, Steel, Metals, Alloys, etc., 299 F.2d 636 (2nd Cir. 1962); N.L.R.B. v. Plumbers Union of Nassau County, etc., 299 F.2d 497 (2nd Cir. 1962).

Section 8(b) (4) (ii) (A) of the Act (29 U.S.C. Sec. 158(b) (4) (ii) (A)) proscribes threats, coercion, or restraint of any person where an object is to require any person to enter into an agreement prohibited by Section 8(e) of the Act. Section 8(b) (4) (ii) (B) of the Act (29 U.S.C. Sec. 158(b) (4) (ii) (B)) renders unlawful, as did the corresponding provisions of 29 U.S.C. Sec. 158(b) (4) (A) in the 1947 Act, the implication of neutral employers in disputes not their own where an object is to force the cessation of business relations between the neutral employer and any other person.

"The impact of the section [is] directed toward what is known as the secondary boycott whose 'sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it.' International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 2 Cir., 181 F.2d 34, 37." [Local 761, International Union of Electrical, Radio and Machine Workers v. N.L.R.B., 366 U.S. 667, 672, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1951).]

 As interpreted by the Board and the courts, Section 8(b) (4) (B) does not prohibit a union from taking traditional primary action against an employer in furtherance of a labor dispute with that employer. It does, however, prevent a union from bringing pressure to bear on the primary employer through any other employer, commonly referred to as a "secondary" employer, in furtherance of such dispute.

In the instant case, respondent, through its agents, engaged in threats, coercion and restraint against Russell and Crenshaw, as well as against Lynn Mecham and Beam Heating and Air Conditioning, for the object of compelling those persons to reaffirm, enter into, comply with, and abide by the collective-bargaining agreements entered into with respondent, particularly the clauses which prohibit the purchasing of round pipe and fittings for commercial projects from Reliable, or other production companies.

 Respondent threatened Russell with a citation for violation of the agreement, threatened Crenshaw with requiring it to pull out of its installation projects round pipe not manufactured by its member, and threatened Beam with a cancellation of its contract and a refusal to refer employees to it. Such conduct clearly threatened, coerced and restrained those contractors, and constituted violation of Section 8(b) (4) (ii) of the Act. N.L.R.B. v. Servette, Inc., 377 U.S. 46, 53–54, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964); N.L.R.B. v. Local 294, International Brotherhood of Teamsters, etc., 342 F.2d 18, 22 (2nd Cir. 1965); N.L.R.B. v. Plumbers Union of Nassau County, 299 F.2d 497, 500 (2nd Cir. 1962); N.L.R.B. v. Highway Truck Drivers, Local No. 107, 300 F.2d 317, 321 (3rd Cir. 1962); N.L.R.B. v. International Hod Carriers, etc., 285 F.2d 397, 403 (8th Cir. 1960), cert. den., 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 203 (1961). Likewise, arbitration or court proceedings to compel compliance with an 8(e) agreement would violate the Act. Retail Clerks Union, Locals 137, et al. v. Food Employers Council, Inc., 351 F.2d 525, 531 (9th Cir. 1965); McLeod

for and on Behalf of N.L.R.B. v. American Federation of Television and Radio Artists, etc., 234 F.Supp. 832 (S.D.N.Y. 1964). And respondent's refusal to refer employees in circumstances where it is signatory to a contract with an employer providing for referral of employees would induce and encourage the employees to engage in strikes and would threaten, coerce, and restrain the employer. Local No. 636, United Association of Journeymen and Apprentices of Plumbing, etc. (The Detroit Edison Company, et al.), 123 NLRB 225, enfd. 108 U.S.App.D.C. 24, 278 F.2d 858 (1960); International Brotherhood of Electrical Workers, Local 501 v. N.L.R.B., 341 U.S. 694, 701–702, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); Local 370, United Association (Baughan Plumbing and Heating Company), 157 NLRB 20 (1966). Similarly, provisions for cancellation of a contract for breach of an 8(e) clause would also violate the Act. Local Union No. 769, International Brotherhood of Electrical Workers (Ets-Hokin Corporation), 154 NLRB 839 (1965); Local 437, International Brotherhood of Electrical Workers (Dimeo Construction Co.), 171 NLRB No. 53 (1968).

■ It appears plain that respondent's threats, coercion, and restraint also had as one of its objectives forcing or requiring contractors signatory to an agreement with respondent to cease purchasing round pipe and fittings from, and to cease doing business with, Reliable. Local 3, International Brotherhood of Electrical Workers (New York Telephone Company), 140 NLRB 729, 730, enfd. N.L.R.B. v. Local 3, International Brotherhood of Electrical Workers, 325 F.2d 561 (2nd Cir. 1963); Building and Construction Trades Council of Tampa (Tampa Sand and Material Co.), 132 NLRB 1564, 1567 (1961); International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 294 (Island Rock Lumber, Inc.), 145 NLRB 484, 488, enfd. N.L.R.B. v. International Brotherhood of Teamsters, etc., 342 F.2d 18 (2nd Cir.

1965). It is well settled that the union's object may be inferred from its acts. New York Mailers' Union, etc. v. N.L.R.B., 114 U.S.App.D.C. 370, 316 F.2d 371, 372 (1963); Local 761, IUE v. N.L.R.B., 366 U.S. 667, 674, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

*Under the statutory scheme an injunction is warranted.*

■ The Act empowers the Board to issue, hear and determine complaints that labor organizations have engaged in unfair labor practices within the meaning of the Act. Congress was aware, however, that proceedings before the Board are protracted and time consuming, and that certain unfair labor practices being committed by labor organizations gave, or tended to give, rise to such serious and unjustifiable interruptions to commerce that their continuance, pending disposition by the Board, would result in irreparable injury to the purpose of the Act. Accordingly, in order to prevent a frustration of the statutory purpose, Congress provided in Section 10(*l*) of the Act for injunctive relief in such cases.

■ Section 10(*l*) embodies the determination of Congress that certain conduct, denominated as unfair labor practices, tends to give rise to such serious and unjustifiable interruptions to commerce as to require its discontinuance, pending adjudication by the Board, to avoid irreparable injury to the policies of the Act and the frustration of the statutory purpose which otherwise would result. Retail Clerks Union, Locals 137, etc. v. Food Employers Council Inc., 351 F.2d 525 (9th Cir. 1965); Local No. 83, Construction, Building Materials and Miscellaneous Drivers Union v. Jenkins, 308 F.2d 516 (9th Cir. 1962); Warehousemen's Union Local 6, etc. v. Hoffman, 302 F.2d 352 (9th Cir. 1962); Building and Construction Trades Council, etc. v. Le Baron, 181 F.2d 449 (9th Cir. 1949).

■ The injunctive relief contemplated in Section 10(*l*) is interlocutory to the final disposition of the unfair

labor practice matter pending before the Board, and is limited to such time as may expire before the Board renders its final decision. As in the case of traditional equity practice with respect to interlocutory relief, the prerequisite to the granting of relief under Section 10(l) is a finding by the district court that there is reasonable cause to believe that a violation of the Act, as charged, has been committed and that equitable relief is "just and proper." The district court is not called upon to decide whether, in fact, a violation of the Act has been committed; the ultimate determination with respect to this question is reserved exclusively for the Board, subject to review by the courts of appeals pursuant to Section 10(e) and (f) of the Act.

 Court of Appeals' review in proceedings of this nature is limited to determining whether or not the court below was "clearly erroneous" in finding reasonable cause to believe that the Act had been violated and in concluding that injunctive relief was appropriate. As was stated by the Ninth Circuit in Local 83, Construction Drivers Union v. Jenkins, supra, 308 F.2d at 517–518:

> "To set aside an order granting a temporary injunction under Section 10(l) of the Act, it must appear that the district court's finding that there was reasonable cause to believe the Act was being violated was clearly erroneous. * * * 'It is sufficient to sustain the district court's finding and conclusion if there be any evidence which together with all of the reasonable inferences that might be drawn therefrom supports a conclusion that there is reasonable cause to believe that a violation had occurred.' Madden v. International Hod Carriers, etc., 277 F.2d 688, 692 (7th Cir. 1960.)."

The Court made it clear that because of the Congressional policy favoring the granting of temporary injunctions under Section 10(l) of the Act in order to prevent irreparable harm, it did not so limit its scope of review when an injunction is denied. Local No. 83, Construction, Building Materials and Miscellaneous Drivers Union v. Jenkins, supra, 308 F. 2d at 517, n. 1. Also see Schauffler v. Highway Truck Drivers & Helpers Local 107, 230 F.2d 7, 9 (3rd Cir. 1956); Retail, Wholesale & Department Store Union AFL–CIO v. Rains, 266 F.2d 503, 505, 506 (5th Cir. 1959); American Federation of Radio & Television Artists AFL–CIO v. Getreu, 258 F.2d 698, 699 (6th Cir. 1958); Madden v. International Organization of Masters, Mates & Pilots of America, Inc., 259 F.2d 312, 314 (7th Cir. 1958), cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958); Madden v. International Hod Carriers' Building & Common Laborers' Union, etc., 277 F.2d 688, 692 (7th Cir. 1960), cert. den. 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960).

 Proceedings instituted under Section 10(l) of the Act are mandatory, not discretionary in nature, and Section 10(l) requires the Regional Director to seek injunctive relief when he has reasonable cause to believe that a violation of Section 8(b) (4), 8(b) (7) or 8(e) has been committed.

> "Section 10(l) reflects a Congressional determination that the unfair labor practices enumerated therein are so disruptive of labor-management relations and threaten such danger of harm to the public that they should be enjoined *whenever a district court has been shown* reasonable cause to believe in their existence and finds that the threatened harm or disruption can best be avoided through an injunction." [Emphasis in original.] [Retail Clerks Union, Locals 137, etc. v. Food Employers Council Inc., supra, 351 F.2d at 531.]

 It is not the function of the court in Section 10(l) proceedings to find that there has in fact been an unfair labor practice committed by the union.

> "That question is to be decided by the National Labor Relations Board in a proceeding * * * pending before that Board. * * * [W]e express no

opinion on that question." [Warehousemen's Union Local 6, etc. v. Hoffman, 302 F.2d 352, 353–354 (9th Cir. 1962).

In proceedings under Section 10(*l*) of the Act, "it is not the court's duty to fully inquire into the merits of the controversy, but simply to determine whether there is sufficient substance to the charges to warrant temporary injunctive relief in order to preserve the status quo." Kennedy v. Construction, Production & Maintenance Laborers' Union, 199 F.Supp. 775, 777 (D.Ariz.1961). The court's role is confined to determining whether the Regional Director has reasonable cause to believe that the Act has been violated, as alleged in his petition, and all that requires is the prima facie establishment of the allegations of such petition. Kennedy v. Los Angeles Joint Executive Board, etc., 192 F.Supp. 339, 341 (S.D. Cal.1961). " * * * [T]he evidence need not establish a violation. It is sufficient to sustain the District Court's finding and conclusion if there be any evidence which together with all the reasonable inferences that might be drawn therefrom supports a conclusion that there is reasonable cause to believe that a violation had occurred." Madden v. International Hod Carriers, et al., 277 F.2d 688, 692 (7th Cir. 1960), cert. den. 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960).

The "reasonable cause" yardstick used in Section 10(*l*) proceedings extends to all elements of the case, such as the status of appellants as labor organizations. In Madden v. International Organization of Masters, Mates & Pilots of America, Inc., 259 F.2d 312 (7th Cir. 1958), cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958), the respondent unions sought dismissal of the Regional Director's petition for injunction on the ground that they were not "labor organizations" within the meaning of the Act. On an appeal from the injunction issued by the lower court, the Court of Appeals for the Seventh Circuit af-

firmed the issuance of the injunction, holding that "[n]o more is required during interlocutory stages than that the district judge ascertain if there is reasonable cause for believing these respondents are 'labor organizations' under the Act. * * * *It is unnecessary for the trial judge to do more than test for reasonable cause.*" [Emphasis supplied.] (259 F.2d at 314.)

In order to establish a prima facie case in Section 10(*l*) proceedings, the Regional Director need not present uncontradicted testimony. Local 450, Int'l Union of Operating Engineers, AFL–CIO v. Elliott, 256 F.2d 630, 638 (5th Cir. 1958); Le Baron v. Los Angeles Building & Construction Trades Council, 84 F.Supp. 629, 635 (S.D.Cal. 1949), affd. 185 F.2d 405 (9th Cir. 1949). "It is not for the court to resolve conflicts in the evidence. That is the function of the Board." Modern v. Building Trades Council, 55 LRRM 2589, 2591 (D.Conn.1964). "This Court being presented with a conflict between the testimony of the two sets of witnesses, does not feel that it can properly resolve the question of credibility in any ultimate manner in this proceeding." Greene v. Bangor Building Trades Council, AFL–CIO, 165 F.Supp. 902, 904 (N. D.Maine 1958). " * * * [T]he court may not resolve conflicting factual evidence and questions of credibility if the Board might reasonably resolve those issues in favor of the plaintiff." Fusco for and on Behalf of N.L.R.B. v. Richard W. Kaase Baking Co., 205 F.Supp. 459, 463 (N.D.Ohio 1962). "[Conflicts in the testimony] raises questions of credibility which the Board must resolve." Jaffee v. Henry Heide, Inc., 115 F.Supp. 52, 57 (S.D.N.Y.1953).

In proceedings under Section 10(*l*) of the Act, if the pleadings raise a dispute as to a question of fact the court will not resolve such question but will, under the statutory scheme, permit the Board to do so. In Local No. 83, Construction, Building Materials and Miscellaneous Drivers Union v. Jenkins,

supra, 308 F.2d at 517, the Court of Appeals for the Ninth Circuit stated:

"In answering, appellant denied that Goodrich assigned three of its regular employees from the unit described in the Local 274 certification and that an object of appellant's conduct was to secure recognition for employees covered by the Local 274 certification. Thus there arose in the pleadings a dispute as to a question of fact. Ordinarily a dispute as to a material question of fact precludes a judgment on the pleadings, but the dispute as to the question raised by the pleadings in the instant case was not within the province of the District Court to resolve; it was one for the Board to decide. It seems apparent, and the District Court so found, that the Board could find either that the certification covered the three Goodrich employees at the Union Rock plant or that it did not. That being the case, there existed reasonable cause raised by the pleadings that appellant was engaging in an unfair labor practice, thus justifying the issuance of the injunction."

■ Under the "reasonable cause" test of Section 10(*l*), the Court need not find that there is a probability that the Board will resolve disputed questions of fact in favor of the petitioner, but merely that there is sufficient evidence from which the Board *could* find a violation of law.

"The phrases 'reasonable clause' or 'reasonable grounds' are standard in law. Their meaning, when made a conclusion for action, has long been established. The test by which compliance is determined is whether the facts are such that a reasonable person *could* be led to believe that they constitute a violation of law. They need not be sufficient to actually prove such violation." [Le Baron v. Los Angeles Building & Construction Trades Council, 84 F.Supp. 629, 635 (S.D.Cal.1949), affd. 185 F.2d 405 (9th Cir. 1949).]

*In proceedings under Section 10(l) of the Act, oral testimony is not required.*

■ Respondent's contention that the affidavits filed in support of the petition for injunction should be rejected and oral testimony ordered is not well taken.

Section 10(*l*) of the Act provides that on the filing of a petition for injunctive relief under that section all persons involved in the charged unfair labor practice "shall be given an opportunity to appear by counsel and present any relevant testimony." However, the Statute does not, in terms, require that a party against whom injunctive relief is sought be given the opportunity to present "oral testimony," but merely "testimony." The latter is a broader term than the former, and is often construed to include written, as well as oral evidence. See 86 C.J.S. Testimony pp. 650–653; III Bouvier's Law Dictionary, Testimony 3264 (Third Revision); Webster's Third New International Dictionary, Testimony 2362 (1961).

More important, if Congress had intended to impose a requirement that injunctive relief under Section 10(*l*) be predicated solely on oral testimony given in open court, with an opportunity for cross-examination, and the introduction of oral testimony by the party against whom relief is sought, it knew how to do so. Thus, Section 7 of the Norris-LaGuardia Act (47 Stat. 71, 29 U.S.C. Sec. 107) explicitly provides:

"No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute * * * except *after hearing the testimony of witnesses in open court (with opportunity for cross-examination) * * * and testimony* in opposition thereto * * *." [Emphasis supplied.]

Indeed, the Senate had before it, at the time it enacted Section 10(*l*), a proposal by Senator Ball which would have modified what is now Section 10(*l*) by,

*inter alia*, making applicable the requirements of Section 7 of Norris-LaGuardia. 93 Cong.Rec. 4887, 5036, 5039; 2 Leg. Hist. 1323–1324, 1348, 1352. (Leg. Hist. denotes the two volume reference to the legislative history of the Labor Management Relations Act of 1947 (G. P.O., 1948)). Thus, it was stated by Senator Ball that, under his proposal:

" * * * any union against which a charge is made, and against which relief is sought, will have greater protection, will be granted notice and full hearing in open court under our amendment, whereas under the provision now in the committee bill, which wipes out all of the safeguards of the Norris-LaGuardia Act and the Clayton Act, there is no such guaranty of notice and open hearing. So I think we go a little further than the committee bill does." (93 Cong.Rec. 5037; 2 Leg. Hist. 1349).

The following colloquy then ensued (93 Cong.Rec. 5037, 5039; 2 Leg.Hist. 1349, 1353):

"MR. FERGUSON. Is there anything in the pending amendment which would require notice to the other side, and hearing, including the right of cross-examination?

"MR. BALL. I think the Senator was not in the Chamber when I explained that the pending amendment goes much further than the committee bill in safeguarding the right of the parties against whom the injunction is sought. We leave in complete effect section 7 of the Norris-LaGuardia Act, with the exceptions of subsections (c) and (e).

* * * * * *

"MR. FERGUSON. I come back to this proposition: If this amendment is adopted, before an injunction can be obtained by an individual or by a district attorney, will it be necessary that there be a hearing, with the right of cross-examination, and a determination by the court that, under the circumstances of the particular case, an injunction should issue; or can the court grant a temporary restraining order after hearing only the plaintiff?

"MR. BALL. The provision in that respect is identical with the provision now in the Norris LaGuardia Act. It requires notice, public hearing, and cross-examination of witnesses in open court, except that the act now permits a temporary restraining order to be issued for not more than 5 days, on a showing that irreparable injury will occur if such temporary restraining order is not granted."

Following further discussion and debate, the Senate rejected Senator Ball's proposed amendment (93 Cong.Rec. 5058; 2 Leg.Hist. 1370), adopting, instead, that section of the committee bill (S. 1126, 1 Leg.Hist. 131–132) which was ultimately enacted as Section 10($l$) of the Act and which does not require as a prerequisite to the grant of injunctive relief that the court hear "testimony of witnesses in open court," but merely that the party against whom injunctive relief is sought have an opportunity to present "relevant testimony," a provision which may be satisfied by affidavits. The bill passed by Congress in 1947 also continued in effect Section 10(h) of the Act, which explicitly makes the Norris-LaGuardia Act inapplicable in proceedings for injunctive relief under the Act.

Furthermore, the standard for granting relief under Section 10($l$) militates against a requirement that oral testimony be adduced as a prerequisite to the grant of injunctive relief. As shown above, a district court is not obliged, in ruling on a request for an injunction under Section 10($l$), to resolve disputed issues of fact, but merely to determine whether there is reasonable cause to belive that there has been a violation of the Act. Schauffler v. Local 1291, ILA, 292 F.2d 182 (3rd Cir. 1961). This, it is clear, may readily be done on the basis of affidavits. See Federal Trade Commission v. Rhodes Pharmacal Co., 191 F.2d 744, 747–748 (7th Cir. 1951); Federal Trade Commission v. Thomsen-

King & Co., 109 F.2d 516, 518 (7th Cir. 1940); United States v. Wilson Williams, Inc., 277 F.2d 535 (2nd Cir. 1960); Securities and Exchange Commission v. F. S. Johns & Co., 207 F. Supp. 566, 573, 574 (D.N.J.1962); United States v. Hughes, 28 F.Supp. 977, 978 (E.D.Wash.1939). And, while there is some authority for the proposition that oral testimony must be admitted to resolve conflicting affidavits when temporary injunctive relief is sought by a private party, such a requirement would be wholly out of place where, as here, the Government is seeking injunctive relief in the public interest and the statutory criterion for the grant of such relief is simply whether reasonable cause has been shown to believe that a violation of the Act has occurred. See Sims v. Greene, 161 F.2d 87 (3rd Cir. 1947); Federal Trade Commission v. Rhodes Pharmacal Co., supra. Indeed, the weight of authority supports the proposition that even in purely private suits for preliminary injunctive relief, the district court may, in the exercise of its discretion, decline to permit the introduction of oral testimony.

Ross-Whitney Corp. v. Smith-Kline & French Lab., 207 F.2d 190, 197–198 (9th Cir. 1953); Hoffritz v. United States, 240 F.2d 109, 111 (9th Cir. 1956); see also Ohio Oil Co. v. Conway, 279 U.S. 813, 814–815, 49 S.Ct. 256, 73 L.Ed. 972 (1929); Gibbs v. Buck, 307 U.S. 66, 77–78, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); Pang-Tsu Mow v. Republic of China, 91 U.S.App.D.C. 324, 201 F.2d 195, 199 (1952), cert. den. 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953). See also 7 Moore, Federal Practice, Para. 65–04[3] at 1639–1641 (2d Ed., 1966); 3 Barron & Holtzoff, Federal Practice and Procedure, § 1433 at 489 (Rev'd. Edition, 1958). Cf. Rule 43(e), F.R.Civ.P.

Nor does this interpretation of Section 10($l$) render meaningless the right of a party against whom injunctive relief is sought to present relevant testimony. Section 10($l$) requires the district court to find reasonable cause to believe the Act to have been violated as a condition precedent to granting injunctive relief, and it is not at all inconceivable that affidavit evidence submitted in opposition to the petition for injunctive relief would lead the district court to find an absence of the requisite reasonable cause. For example, an affidavit of Rocky Stoneburner, respondent's business agent, to the effect that he had been out of the country on the date the Regional Director asserts he threatened Crenshaw, coupled with documentary evidence in support of that affidavit, presumably would preclude the court from finding that the Regional Director has reasonable cause to believe that the threat had taken place.

Admittedly, there can be instances in which, even if the Regional Director has carefully prepared his case, a reasonable factual basis for believing the Act to have been violated will not be found, but that will be the case whether or not oral testimony is required, and is wholly consistent with Congress' intention in enacting Section 10($l$) that the Regional Director to able to obtain injunctive relief promptly and easily in cases in which his investigation of a charge alleging a violation of Section 8 (b) (4), 8(b) (7) or 8(e) leads him to believe that a complaint should be issued.

Rule 65, Federal Rules of Civil Procedure, does not require the presentation of oral testimony. Since the Regional Director has the burden of establishing the right to injunctive relief in Section 10($l$) proceedings it is advisable that he produce oral testimony when and to the extent feasible, and he often is permitted to do so. While verified pleadings and affidavits are of service in determining the merits of the usual injunction case, and courts are normally reluctant to decide controverted factual issues in favor of the movant on affidavits alone, since the function of the courts in Section 10($l$) proceedings is only to test for "reasonable cause" the merits of the case are not reached and controverted factual issues not decided. Rule 65, to the extent applicable here,

merely requires that notice be given and hearing be had, both of which were satisfied in the proceedings in the court. And see Schauffler v. Local 1291, ILA, 189 F.Supp. 737, 741 (E.D.Pa.1960), in which the court stated:

"Section 10(*l*) of the Act provides a method of procedure which is inconsistent with and takes precedence over the provisions of the Federal Rules which respondent wishes to apply. To follow those provisions, with all their attendant delays, would frustrate the Congressional intent to provide for speedy injunctive relief pending determination of the controversy by the National Labor Relations Board. It is enough in this case that the respondent has had sufficient notice and an opportunity to be heard and present evidence and argument."

■ Moreover, a district court may, in the exercise of sound discretion, grant a preliminary injunction on the basis of affidavits. Cf. Johnston v. J. P. Stevens & Co., 341 F.2d 891 (4th Cir. 1965). As was stated by the Court of Appeals for the Ninth Circuit in Ross-Whitney Corp. v. Smith-Kline & French Laboratories, 207 F.2d 190, 198 (9th Cir. 1953):

"In our view, a preliminary injunction may be granted upon affidavits. A requirement of oral testimony would in effect require a full hearing on the merits and would thus defeat one of the purposes of a preliminary injunction which is to give speedy relief from irreparable injury. Where the injunction is granted, the enjoined party is protected by the requirement that the petitioner post a bond and by the requirement that the court support its discretionary action with findings of fact and conclusions of law."

The affidavits of Rudley, Wilson, Darrow, Feuer, Mecham, and Beam, all of whom are signatories to an agreement with respondent and the first four of whom are members of either SMACCASC or HVAC, are made on personal knowledge, set forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. The same is true of the affidavits of Bantick, Allsweet, and Block with the exception of a portion of Block's supplemental affidavit relating to the survey. The supplemental affidavit of Block, insofar as it sets forth the purchases of round pipe and fittings by other contractors, contains hearsay material. Although such material is of a hearsay nature, the other affidavits on file show a pattern and lend support to the claim that a substantial number of contractors in the Southern California area and in the SMACCASC and HVAC multi-employer unit have purchased substantial amount of round pipe and fittings from production companies rather than having made such materials themselves. The affidavit of Darrow, a member of HVAC and a signatory to an agreement with the respondent, reflects that he is capable of producing more round pipe and fittings than he uses on his own jobs but he has not had a demand for such materials from other contractors. Although the supplemental affidavit of Block with respect to the survey conducted by him may not measure up to the evidentiary standards of Rules 56(e), Federal Rules of Civil Procedure, for summary judgments, its weakness has not been adequately shown by any opposing affidavits. While the affidavit of Clyde Ringwood, respondent union's business manager, attempts to refute some of the figures contained in the Block survey, such an affidavit is no less hearsay that the Block affidavit. Moreover, only an issue of credibility is raised, which is a function of the Board to resolve and not this Court's.

■■ Speed is often extremely important in proceedings for restraining orders and temporary injunctions, and both the movant and the opposing party are often unable to obtain and marshal their evidence in a manner that would be proper for a summary judgment hearing or for an actual trial. Affida-

vits at best are not too trustworthy either for a summary judgment or an injunction hearing and, undoubtedly, in relation to the latter hearing, affidavits that measure up to the standards for a summary judgment are preferable to those of a more general character. Oral testimony, of course, is even better. But the court may properly consider affidavits at preliminary injunction hearings which do not measure up to the standards of the summary judgment affidavits. 7 Moore's Federal Practice, para. 65.04 [3] at 1641 (2nd Ed., 1966). This is particularly true where, as here, the court is merely testing for reasonable cause.

■■■ The statutory standard of "reasonable cause" is satisfied if there is a showing of factual issues which must be resolved by the Board. Section 10(*l*) commands the courts to disregard their traditional reluctance to issue preliminary injunctions when there is a substantial conflict in the evidence. As the Court of Appeals for the Ninth Circuit stated, Section 10(*l*) embodies a "[c]ongressional policy favoring the granting of temporary injunctions." Local No. 83, Construction, Building Materials and Miscellaneous Drivers Union v. Jenkins, 308 F.2d 516, 517 n. 1 (9th Cir. 1962).

■■ Rule 43, Federal Rules of Civil Procedure, dealing with the presentation of evidence generally, provides, in subsection (e), that "[w]hen a motion is based on facts not appearing on record the court *may* hear the matter on affidavits presented by the respective parties [or] * * * *may* direct that the matter be heard orally or partly on oral testimony or depositions." Thus, as can be seen, neither Rule 43 nor Rule 65 requires oral testimony in injunction proceedings. Cases to the contrary are premised on a reluctance to issue a preliminary injunction where there is a substantial conflict in the evidence, and the facts supporting preliminary relief are not clearly established, two factors which are inapplicable here.

In accordance with the foregoing, which shall also constitute findings of fact and conclusions of law, the Court now makes its formal Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

1. Petitioner is the Regional Director of Region 21 of the Board, an agency of the United States, and filed this petition for and on behalf of the Board.

2. (a) On or about November 28, 1967, Reliable Steel Supply Company, a Division of Pacific Industries (herein called Reliable), Sugden Engineering Company (herein called Sugden), and Metal Products Manufacturer's Association (herein called MPMA), pursuant to provisions of the Act, filed with the Board a joint charge alleging that Sheet Metal Workers International Association Local 108 (herein called Local 108), a labor organization, has engaged in, and is engaging in, unfair labor practices within the meaning of, *inter alia,* 29 U.S.C. Sec. 158(b) (4) (ii) (A) and (B).

(b) On or about November 28, 1967, pursuant to provisions of the Act, Reliable, Sugden, and MPMA also filed with the Board a similar charge alleging that respondent Local 108 has engaged in, and is engaging in, unfair labor practices within the meaning of 29 U.S. C. Sec. 158(e).

3. The aforesaid charges were referred to petitioner as Regional Director of Region 21 of the Board.

4. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent Local 108, an unincorporated association, is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, and other terms or conditions of work. Respondent Local 108 is, and at all times material herein has been, a labor organization within the meaning of 29 U.S.C. Sec. 152(5).

(b) Paul Massie, Rocky Stoneburner, and Clyde Ringwood are, and at all

times material herein have been, business representatives of respondent Local 108, acting on its behalf, and its agents within the meaning of Section 2(13) of the Act (29 U.S.C. Sec. 152(13)).

(c) Respondent Local 108 maintains its principal office at Los Angeles, California, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members.

(d) Respondent Local 108 is affiliated with the Sheet Metal Workers' International Association, AFL-CIO (herein called International), as a sheet metal building and construction workers' local union whose members fabricate, erect, and install sheet metal products and materials on construction projects. Other local unions affiliated with International include sheet metal production workers' locals and industrial sheet metal workers' locals whose members are employed in manufacturing plants for the mass production of sheet metal products used in the construction industry. The sheet metal construction workers' locals customarily negotiate wage rates with employers which are higher than the wage rates negotiated by the sheet metal production workers' locals or industrial sheet metal workers' locals.

(e) MPMA is an association of employers located in Southern California engaged in the manufacture and distribution, at wholesale, of sheet metal pipe, ducts, fittings, and other products of sheet metal, for use in the heating, ventilating, and air conditioning industry. MPMA was organized for the purpose of mutual exchange and dissemination of information concerning labor relations matters and other matters affecting the industry engaged in by its employer-members. Employer-members of MPMA annually both receive from and ship to points and places outside the State of California goods, materials, supplies or products valued at in excess of $50,000.

(f) At all times material herein, Reliable has been engaged at Los Angeles,

California, in the manufacture and distribution of metal products, including round pipe and fittings used in the installation of air conditioning and heating systems. In the course and conduct of its business, Reliable annually ships metal products to and receives goods, materials, and supplies from points and places outside the State of California valued at in excess of $50,000. At all times material herein Reliable has recognized and has had a collective-bargaining agreement with Sheet Metal Workers Association Local 170, a sheet metal production workers' local affiliated with the International. Reliable is, and at all times material herein has been, a member of MPMA.

(g) Sheet Metal and Air Conditioning Contractors Association of Southern California, Inc. (herein called SMACCASC), and Heating, Ventilating and Air Conditioning Contractors Association (herein called HVAC), each a California corporation with principal office and place of business at Los Angeles, California, are associations of employers engaged as sheet metal, heating, ventilating, and air conditioning installation contractors in the building and construction industry in the Southern California area. SMACCASC and HVAC each is organized and exists for the purpose, among others, of negotiating, entering into, and administering collective-bargaining agreements on behalf of each of its employer-members with the labor organization or organizations representing each of its respective employees. During the past year, in the course and conduct of their business operations, employer-members of SMACCASC and HVAC, collectively, have purchased and received goods, materials, and supplies valued at in excess of $50,000 which said goods, materials, and supplies were shipped to them, or to their immediate suppliers in the State of California, directly from sources outside the State of California.

(h) For the past several years, SMACCASC and HVAC, on behalf of their respective employer-members, have

duly recognized and bargained collectively with respondent Local 108 as the collective-bargaining representative of the employees of their respective employer-members engaged in the installation of sheet metal materials and products on construction jobs and in the fabrication in their shops of custom-made sheet metal products for erection or installation on their construction projects. SMACCASC and HVAC, on behalf of their respective employer-members, have regularly negotiated and entered into successive collective-bargaining agreements with respondent Local 108.

(i) For the past several years, a substantial number of employer-members of SMACCASC and HVAC have regularly purchased from manufacturers, suppliers, and distributors, including Reliable, their requirements of certain sheet metal products manufactured by employer-members of MPMA, and of other manufacturers, including, particularly, round or furnace pipe and fittings. These manufactured products have for many years past been regularly installed by the sheet metal construction workers employed by employer-members of SMACCASC and HVAC.

(j) Many employer-members of SMACCASC and HVAC have in the past manufactured or fabricated no round pipe or fittings while others have manufactured or fabricated only insignificant amounts. A substantial amount of round pipe and fittings used by employer-members of SMACCASC and HVAC on their construction or installation projects has been purchased from Reliable, or other manufacturers, who are not members of SMACCASC or HVAC, or who do not have a collective-bargaining agreement with respondent Local 108.

(k) Crenshaw Sheet Metal Company (herein called Crenshaw) is engaged at Los Angeles, California, as a heating and air conditioning contractor in the course and conduct of which business Crenshaw installs heating and air conditioning systems. Crenshaw is, and at all times material herein has been, a member of HVAC. At all times material herein, Crenshaw has been a party to a collective-bargaining agreement with respondent Local 108.

(l) Russell Heating & Air Conditioning Co. (herein called Russell) is engaged at Van Nuys, California, as a heating and air conditioning contractor in the course and conduct of which business Russell installs heating and air conditioning systems. Russell is, and at all times material herein has been, a member of HVAC. At all times material herein, Russell has been a party to a collective-bargaining agreement with respondent Local 108.

(m) On or about July 1, 1965, SMACCASC and HVAC, acting for and on behalf of their respective employer-members, entered into a written collective-bargaining agreement with respondent Local 108 entitled "Standard Form of UNION AGREEMENT and ADDENDA THERETO From July 1, 1965 to June 30, 1970 Between LOCAL UNION NO. 108, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION and SHEET METAL AND AIR CONDITIONING CONTRACTORS ASSOCIATION OF SOUTHERN CALIFORNIA, INC. and HEATING, VENTILATING AND AIR CONDITIONING CONTRACTORS ASSOCIATION."

(n) Pursuant to Article XIV, Section 2, of the aforesaid collective-bargaining agreement, in about April, 1966, HVAC and respondent Local 108, and in about September, 1967, SMACCASC and respondent Local 108, adopted and put into effect a revision and modification of a portion of their collective-bargaining agreement entitled "Standard Form of Union Agreement, Form A–4–66," replacing a portion of their collective-bargaining agreement entitled "Standard Form of Union Agreement, Form A–5–15–63."

(o) The collective-bargaining agreement between SMACCASC and HVAC and respondent Local 108, as revised by

Standard Form A–4–66, contains, *inter alia*, the following provisions:

Article I, Section 1:

"This agreement covers the rates of pay, rules and working conditions of all employees of the employer engaged in * * * manufacture, fabrication, assembling * * * of all * * * metal work of U.S. #10 gauge * * * or lighter gauge * * * all other work included in the jurisdictional claims of Sheet Metal Workers' International Association."

Article II, Section 2:

"Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein, such prefabrication shall be subcontracted to fabricators who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under provisions of this Agreement."

Article VIII, Section 2:

"On all work specified in Article I of this Agreement, fabricated and/or assembled within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other Local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the job site Union shall be paid to the journeymen employed on such work in the home shop or sent to the job site."

Article VIII, Section 3:

"Notwithstanding the provisions of Section 2 of this Article and Section 2 of Article II, the following items may be manufactured for sale to the trade or purchased at the rates specified below:

* * * * * *

6. Fabricated pipe and fittings for residential installations only (production wage rate) * * *"

Article XV, Section 1:

"Any person employed by the Employer to perform any of the work covered in Article I, Section 1 of the Standard Form of Union Agreement is defined and hereinafter called 'Employee.'"

Article LIII, Section 1:

"* * * The Employer agrees that only Employees as covered by this Agreement shall be assigned to perform such work as covered by Article I of the Standard Form of Union Agreement."

Article LXII, Section 2:

"Except as outlined above, all custom or special design sheet metal items and work described in Article I, Section 1, of the Standard Form of Union Agreement used on any other type of construction or sheet metal work, shall be performed only by Employees covered by and pursuant to this Agreement."

(p) In or about October, 1967, respondent and George S. Fawcett Company (herein called Fawcett), and SMACCASC, the latter on behalf of its employer-member, Fawcett, re-entered into a written collective-bargaining agreement containing the provisions set forth in Finding of Fact 4(o), above.

(q) In about August, 1967, respondent prepared a draft of, and proposed to SMACCASC and HVAC a joint letter to be sent to the employer-members of SMACCASC and HVAC advising the said members, in effect, that as of January 1, 1968, sheet metal work shall be performed only by employees covered under the collective-bargaining agreement with respondent Local 108, with the exception of certain residential work or unless a waiver pursuant to provisions of the agreement was first obtained from respondent. The said proposed letter purported to advise the members of SMACCASC and HVAC that violations shall be cause for assess-

ment of liquidated damages, but the said proposed letter was never sent to the members.

(r) Crenshaw and Russell have for many years in the past purchased round pipe and fittings from Reliable; at no time material herein has either of them regularly or customarily made or manufactured such pipe in its own shop.

(s) In early June, 1967, respondent Local 108, by Paul Massie, notified Russell that Russell was subject to being cited with violations of its collective-bargaining agreement with respondent by purchasing round pipe from Reliable rather than fabricating such pipe with its employees who are members of respondent Local 108. Although Massie said that he did not know where Russell was buying its round pipe, and did not want to know, he said he was informing Russell that Russell was going to be cited before the Joint Adjustment Board for violation of its agreement since the agreement did not allow Russell to purchase round pipe but required it to fabricate such pipe in its own shop.

(t) About the middle of December, 1967, respondent Local 108, by Rocky Stoneburner, notified Crenshaw that on commercial projects Crenshaw could not use any round pipe not manufactured or fabricated by employees represented by Local 108 and that the use of round pipe fabricated or manufactured by Reliable was not acceptable since Reliable had no collective-bargaining agreement with Local 108. At the same time, Stoneburner informed Crenshaw that if respondent caught Crenshaw using pipe produced by non-members of respondent, Crenshaw would be required to pull it out because respondent's agreement with Crenshaw, a section of which Stoneburner read to Crenshaw's president, Rudley, provided that Crenshaw could not use any pipe not fabricated by respondent's members and that all metal had to be fabricated and installed by respondent's members. Stoneburner did not say anything about pulling respondent's members off of any Crenshaw job.

(u) For many years up to and including the present time respondent Local 108 has maintained a Joint Apprenticeship Training Program with employers party to its collective-bargaining agreement under which apprentices have always been, and are now, specifically taught in classes and trained in the shops to make round duct and required to learn the skills and techniques used in the fabrication of round duct.

(v) By Article II, Section 2, Article VIII, Sections 2 and 3, Article LIII, Section 1, and Article LXII, Section 2, of the collective-bargaining agreement set forth above, respondent Local 108 and SMACCASC and HVAC, and their respective signatory employer-members, have agreed that when subcontracting prefabrication of, or purchasing round pipe and fittings for commercial projects, signatory employer-members of SMACCASC and HVAC will subcontract only to, or purchase only the products of, fabricators or manufacturers who pay their employees engaged in such fabrication or production not less than the prevailing wage for comparable sheet metal fabrication or production as established under agreements between Local 108 and other employers.

(w) At all times material herein respondent Local 108 has demanded, and continues to demand, that employer-members of SMACCASC and HVAC fully comply with the provisions of the contract clauses set forth in Finding of Fact 4(o), above, and, in particular, that such employer-members cease and refrain from purchasing round pipe and fittings for installation on commercial or industrial construction jobs from manufacturers or fabricators who are not parties to a collective-bargaining agreement with Local 108 or who pay their production employees less than the sheet metal construction workers' union wage rates. As a consequence, some employer-members of SMACCASC and HVAC have ceased purchasing round pipe fabricated by Reliable and others have substantially reduced their pur-

chases, and to such extent have ceased doing business with Reliable.

(x) Pursuant to the contract clauses set forth in Finding of Fact 4(o), above, employer-members of SMACCASC and HVAC have ceased or refrained, and have agreed to cease or refrain, from handling, using, selling, transporting, or otherwise dealing in the products of Reliable, and of other persons, and from doing business with Reliable, and other persons.

(y) By the acts and conduct set forth in Findings of Fact 4(s) and 4(t), above, respondent Local 108 threatened, coerced, and restrained Russell and Crenshaw.

(z) Objects of the acts and conduct of respondent Local 108 set forth in Findings of Fact 4(s), 4(t), and 4(y), above, have been, and are: (1) to force or require Russell, Crenshaw, and other persons, to enter into an agreement which is prohibited by 29 U.S.C. Sec. 158(e); and (2) to force or require Russell, Crenshaw, and other persons, to cease using, selling, handling, transporting, or otherwise dealing in the products of Reliable, and of other producers, processors, or manufacturers, and to cease doing business with Reliable, and other persons.

5. It may fairly be anticipated that, unless enjoined, respondent Local 108 will continue or repeat the acts and conduct set forth in Findings of Fact 4(s), 4(t), 4(y), and 4(z), above, or similar or like acts and conduct in violation of 29 U.S.C. Sec. 158(b) (4) (ii) (A) and (B), and will continue to give effect to the contract clauses set forth in Finding of Fact 4(o), above, or enter into a similar or like agreement or contract clauses in violation of 29 U.S.C. Sec. 158(e).

6. The following Conclusions of Law, insofar as they may be concluded Findings of Fact, are so found by this Court to be true in all respects. From the foregoing facts the Court concludes that:

## CONCLUSIONS OF LAW

### I

This Court has jurisdiction of the parties and of the subject matter of this proceeding, and under 29 U.S.C. Sec. 160($l$) is empowered to grant injunctive relief.

### II

There is, and petitioner has, reasonable cause to believe that:

(a) Respondent is a labor organization within the meaning of 29 U.S.C. Secs. 152(5), 158(b), 158(e), and 160($l$).

(b) Reliable, the employer-members of SMACCASC and HVAC, and the employer-members of MPMA are engaged in commerce within the meaning of 29 U.S.C. Sec. 152(6) and (7).

(c) Reliable, the employer-members of SMACCASC and HVAC, and the employer-members of MPMA are engaged in commerce or in an industry affecting commerce.

(d) SMACCASC and HVAC and their respective employer-members are employers within the meaning of 29 U. S.C. Secs. 152(2) and 158(e).

(e) Respondent has engaged in unfair labor practices within the meaning of 29 U.S.C. Secs. 158(b) (4) (ii) (A) and (B) and 158(e), affecting commerce within the meaning of 29 U.S.C. Sec. 152(6) and (7), and a continuation of these practices will impair the policies of the Act as set forth in 29 U.S.C. Sec. 151(b).

(f) Any conclusion of law contained in the Findings of Fact is deemed incorporated herein by reference.

### III

To preserve the issues for the orderly determination as provided in the Act, it is appropriate, just and proper that, pending the final disposition of the matters herein involved pending before the Board, respondent, its officers, representatives, agents, servants, employees, attorneys, and all members, persons and

labor organizations acting in concert or participation with it, be enjoined and restrained from giving effect to, maintaining or enforcing the contract clauses set forth in Finding of Fact 4(o), above, and from the commission, continuation, or repetition of the acts and conduct set forth in Findings of Fact 4(s), 4(t), 4(y), and 4(z), above, acts and conduct in furtherance and support thereof, or like or related acts or conduct the commission of which in the future is likely or may fairly be anticipated from respondent's acts and conduct in the past.

Now, therefore, upon the entire record, it is

ORDERED, ADJUDGED AND DECREED that, pending the final disposition of the matters involved pending before the National Labor Relations Board, respondent Sheet Metal Workers International Association Local 108, its officers, representatives, agents, servants, employees, attorneys, and all members, persons and labor organizations acting in concert or participation with it, be, and it hereby is, enjoined and restrained from:

(a) Maintaining, giving effect to, or enforcing Article II, Section 2; Article VIII, Sections 2 and 3; Article LIII, Section 1; and Article LXII, Section 2, or any of them, of the collective-bargaining agreement entered into on or about July 1, 1965, by and between SMACCASC and HVAC, and their employer-members, SMACCASC and HVAC acting for and on behalf of their respective employer-members, and respondent Local 108, entitled "Standard Form of UNION AGREEMENT and ADDENDA THERETO From July 1, 1965 to June 30, 1970 Between LOCAL UNION NO. 108, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION AND SHEET METAL AND AIR CONDITIONING CONTRACTORS ASSOCIATION OF SOUTHERN CALIFORNIA, INC., and HEATING, VENTILATING AND AIR CONDITIONING CONTRACTORS ASSOCIATION," as revised by "Standard Form of Union Agreement, Form A–4–66," insofar as the said Articles require the employer-members of SMACCASC and HVAC, or of either of them, to cease or refrain from purchasing round pipe or fittings manufactured by Reliable, or by any other manufacturer or fabricator who may pay his production employees wages which are less than the prevailing wages for comparable sheet metal fabrication as established under agreements with respondent Local 108 and other sheet metal fabricators, or between other locals affiliated with the International (whether sheet metal workers' locals, building and construction locals, production locals, or industrial locals), and sheet metal fabricators;

(b) Entering into, maintaining, giving effect to, or enforcing any other contract or agreement, express or implied, whereby SMACCASC or HVAC, or their respective employer-members, or any of them, cease or refrain, or agree to cease or refrain, from handling, using, selling, transporting, or otherwise dealing in any of the products of Reliable, or employer-members of MPMA, or any of them, or of any other employer, or from doing business with Reliable, or with any other person.

(c) In any manner or by any means threatening, coercing, or restraining Russell, Crenshaw, or any other person, where in either case an object thereof is: (1) to force or require Russell, Crenshaw, or any other person, to maintain in effect, give effect to, or abide by Article II, Section 2, Article VIII, Sections 2 and 3, Article LIII, Section 1, or Article LXII, Section 2, of respondent Local 108's aforesaid collective-bargaining agreement with employer-members of SMACCASC or HVAC, or of either of them, as revised by Standard Form of Union Agreement, Form A–4–66; (2) to force or require Russell, Crenshaw, or any other person, to enter into, maintain in effect, give effect to, or abide by any other contract or agreement, express or implied, whereby Russell, Crenshaw, or any other person, cease or refrain, or agree to cease or refrain, from handling, using, selling, transporting, or otherwise

dealing in the products of Reliable, or of any other employer-member of MPMA, or of any other person, or from doing business with Reliable, or with any other person; (3) to force or require Russell, Crenshaw, or any other person, to enter into any agreement prohibited by 29 U.S.C. Sec. 158(e); or (4) to force or require Russell, Crenshaw, or any other person, to cease using, selling, handling, transporting, or otherwise dealing in the products of Reliable, or of any other person, or to cease doing business with Reliable, or with any other person.